IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                        Plaintiff,

      -v-

$90,385 UNITED STATES CURRENCY,

                        Defendant.

_____

## VERIFIED COMPLAINT FOR FORFEITURE

The United States of America, by its attorney, James P. Kennedy, Jr., United States Attorney for the Western District of New York, Mary Clare Kane, Assistant United States Attorney, of counsel, for its verified complaint for forfeiture herein alleges as follows:

## INTRODUCTION

1.    This is an action in rem for the forfeiture of $90,385 United States currency, (hereinafter the "defendant currency"). The defendant currency is subject to forfeiture under the provisions of: (1) Title 18, United States Code, Section 981(a)(1)(C), as any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title and hereinafter referred to as "SUA"), namely, wire fraud in violation Title 18, United States Code, Sections 1343 and conspiracy to commit wire fraud in violation of Title 18, United States Code, Sections 1349; and (2) Title 18, United States Code, Section 981(a)(1)(A) as property involved in a money laundering transaction and/or as property traceable to such property.

2.     This Court has subject matter jurisdiction of this action pursuant to Title 28, United States Code, Sections 1345 and 1355(a) and in rem jurisdiction pursuant to Title 28, United States Code, Sections 1355(b) and 1355(d). Venue is properly premised in the Western District of New York pursuant to Title 28, United States Code, Section 1395.

3.     The defendant currency was seized on May 7, 2020, pursuant to a federal search warrant issued on April 30, 2020, by the Honorable Michael J. Roemer, United States Magistrate Judge, for the residence of 316 Hamilton Boulevard, Kenmore, New York.  The defendant currency was placed in and remains in the custody of the Port Director, United States Customs and Border Protection, Buffalo, New York, within this judicial district.

## COMMON DEBT COLLECTION INDUSTRY LANGUAGE

4.     The following terms are relevant to operations in the debt collection industry and the allegations in this complaint:

a.     Merchant Account:  A merchant account is held by a financial institution which allows the client/account holder to accept credit/debit card payments from customers.  It is common for unlawful debt collection groups engaged in wire fraud schemes to have access to several merchant accounts, tied to several bank accounts, to process payments from victims due to the likelihood of an account being shut down for fraud, chargebacks or otherwise.

b.     Payment Processing:  Payment processing is the system and protocol in the debt collection industry for accepting payments.  Proceeds typically follow the following pathway: collect payment from debtors; submit payment information to the merchant accounts (sometimes relayed through several entities); and, disburse actual

proceeds from the merchant accounts back to the bank accounts controlled by the debt collector (liquidation).

  c. <u>Third-Party Payment Processor</u>:  Debt collectors engaged in fraud often use "third-party payment processors" as a partner entity for debtor (victim) payment processing.  These third-party payment processors usually maintain the merchant accounts, some being in connection with a legitimate business, which they allow to be used by other debt collection organizations to accept debtor payments.  In exchange for the use of their merchant accounts, the third-party processor will collect a fee or percentage from the monies processed through the account collected by other debt collection businesses.

  d. <u>Chargebacks</u>:  A "chargeback" is essentially a consumer request to a credit card company or card servicer for the reversal of a transaction.  Due to common unlawful debt collection tactics involving threats and misrepresentations used to coerce payments from victims by certain businesses engaging in a wire fraud scheme, it is common for victims of these schemes to later seek chargebacks of their payments.  A high chargeback percentage against a debt collection business is empirical data suggesting the existence of a wire fraud scheme.  These chargebacks are claims corroborated by the victim and the victim's credit/debit card servicer.

  e. <u>Know your Customer ("KYC")</u>:  The KYC business model is standard and required by law for financial institutions, including payment processors.  It is meant to retain the integrity of the financial market and was employed as a means to combat terrorism in the Patriot Act.

  f. <u>Debt portfolios a/k/a paper</u>: Debt portfolios contain a debtors' personal information related to a current or past loan account.  Debt portfolios and outstanding debts may be bought and sold among various entities in the debt collection industry.  In certain cases, the debt portfolios wire fraud schemes/unlawful debt collection businesses seek, purchase, and use are typically exploited and misused.

  g. <u>Over biffing</u>: Over-biffing or "juicing" is a tactic that falsely inflates a debt balance.  The debtor is overcharged, and the debt collector fraudulently collects more than what is owed. The term is called "overbiffing" because the scammers overstate a person's "balance in full," which is sometimes shortened to BIF.

## **APPLICABLE LAW**

5.      False or Misleading Practices -The Fair Debt Collection Practices Act ("FDCPA"): states in relevant parts, Title 15, United States Code, 1692e:

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.  Without limiting the general application of the foregoing, the following conduct is a violation of this section:

… (2) The false representation of—

(A) the character, amount, or legal status of any debt; or

(B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.

(3) The false representation or implication that any individual is an attorney or that any communication is from an attorney.

(4) The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action.

(5) The threat to take any action that cannot legally be taken or that is not intended to be taken.

. . . .

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

(13) The false representation or implication that documents are legal process.

. . . .

(14) The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization.

4

## BASIS FOR FORFEITURE

6.     An investigation conducted by U.S. Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), discovered that Mark M. Miller owned and operated the following businesses which engaged in a wire fraud scheme related to unlawful debt collection activities involving victims across the United States:

     a.   American Elite Contractors, LLC: this Limited Liability Company ("LLC") was the business name of Miller's small roofing business which did conduct legitimate business related to roofing and construction on a local level.

     b.   American Elite Recovery, LLC: this LLC was used by Miller for debt collection activity in or about 2018 and 2019.

     c.   AME Professionals, LLC: this LLC was used by Miller for debt collection activity and banking in or about 2019 and 2020.

     d.   East Coast Business Solutions, Inc: this corporation was used by Miller for debt collection and business banking activity in or about the spring of 2020.

     e.   Oak Barnes and Associates, Law Office of American Elite, and others: these unregistered business names, and variations of them, are false entities fabricated by Miller and Associates.

(hereinafter collectively referred to as "Miller's debt collection businesses").  Miller has been active in the debt collection industry since about 2016 (at that time under the business name American Recovery Services, or ARS).

7.     Miller operated and managed his debt collection schemes with Associate-1, Associate-2, Associate-3, and Associate-4[1] (hereinafter collectively referred to as "Associates"); and several other employees. Miller and his Associates willfully, knowingly, and intentionally operated Miller's businesses, and executed the illegal debt collection tactics in order to demand payments from victims as part of the overall wire fraud scheme. The Associates and employees engaged in the aforesaid illegal tactics under the direction and approval of Miller.

8.     Miller utilized his debt collection businesses to defraud victims by unlawfully collecting debts, mostly by telephone.  Miller targeted victims outside of New York State. Miller and his Associates engaged in purchasing, stealing, or reusing debt portfolios from sources, including other debt collectors.  Miller and Associates, in certain cases, illicitly obtained or stole debt portfolios from other debt collectors by creating electronic copies of

---

[1] HSI has identified these Associates but has redacted their names from this Complaint.

data in the portfolios and collected on debt portfolios of which they had no rightful ownership. Miller and his Associates collected and cataloged debtors' personal information stemming from previous, legitimate loans. When Miller and Associates exploited data from said debt portfolios, Miller's businesses intentionally contacted and defrauded unwitting debtors/victims for financial gain using "scare" tactics; and used details of the victims' personal and previous loan information which imposed a false legitimacy, all in violation of FDCPA.

9.     While under Miller's control, Miller's Associates collected on certain debt portfolios through false or misleading practices. Miller's employees, as directed by Miller and Associates: (1) called victims in an attempt to collect an already paid debt; (2) used threats and scare tactics to cause payments from the victims; (3) engaged in "over-biffing; and (4) used profane, abusive, and illegal tactics to collect the fabricated bills.

10.     Miller and his Associates directed and oversaw the use of false or misleading practices by employees of Miller's businesses. Miller's Associates and employees would contact debtors (victims) telephonically, and via email, and coerce them into making payments by false or misleading practices via interstate wires, in violation of the FDCPA. Miller's Associates and employees impersonated or claimed to be couriers, process servers, or attorneys. They threatened false law enforcement action, civil lawsuits, criminal charges, and threatened to serve legal process at the debtor(s)'/victim(s)' home or place of

7

employment. Associates and employees utilized aliases when identifying themselves to the debtors/victims. These aliases changed periodically in attempts to elude consumers and investigators.

11.     Miller and Associates frequently changed telephone numbers used by Miller's debt collection business.  By frequently changing business telephone numbers, Miller and Associates intended to insulate the businesses' tactics from consumer complaints and detection by law enforcement.

12.     The unlawfully obtained payments from the victims collected through interstate wires constitute SUA proceeds.  The victim credit/debit card payments were collected, submitted, and processed through third-party payment processors which serviced Miller's business.  These third-party payment processors had access to merchant accounts and would disperse the debt collection proceeds, which were proceeds of SUA, to Miller. The proceeds were moved through several accounts, then reverted back to the third-party payment processor, who was responsible for remitting the respective amount back to Miller.

13.     Based on the training and experience of law enforcement related to unlawful debt collection schemes, third-party payment processors hold merchant accounts and are routinely enlisted by bad actors to handle the payments of victims. Unlawful debt collection businesses likely engaged in wire fraud/money laundering schemes utilize third-party payment processors.  The third-party payment processors typically establish several entities

and bank accounts to maintain the illegal scheme's continuity.  Generally, a service fee is paid to third-party payment processors or merchants, based on a percentage of money deposited.

14.     From about September of 2017 to May of 2020, Miller typically utilized third-party payment processors located in the Western District of New York identified as: Universal Acme Empire (a/k/a Law Firm), Market Street Debt Partners, Great Lakes Processing, and others.

15.     It is known by law enforcement that third-party payment processors in the Western District of New York have developed a method to process criminal proceeds on behalf of outside clients and place these criminal proceeds into the banking system.  This third-party payment processing industry is a necessary element for wire fraud schemes involving bad collection practices because it is difficult for wire fraud schemes/unlawful debt collectors to maintain a payment processing/merchant system in-house due to the scrutiny of financial institutions.  Financial institutions and merchant services that process debit/credit cards are aware of high-risk clients (like debt collectors) and typically opt to close these accounts once they learn of derogatory consumer complaints and/or chargebacks.  Further, legitimate merchant services accounts will typically decline clients with criminal and/or derogatory business histories.  Many financial institutions will not accept or maintain business bank accounts for debt collection businesses, or, if they do, will close the bank accounts if

they discover a debt collection business has misrepresented their nature of business in order to open a bank account.

## MILLER's JAIL CALLS

16.     From about March 2019 to August 2019, Miller was incarcerated in the Niagara County, New York Jail.  From a jail telephone that recorded calls, Miller typically, on a daily basis, discussed running his businesses with various Associates.  The following excerpts provide an example:

a.     *May 12, 2019: Mark MILLER and (girlfriend):*

*Girlfriend: Hi.  It's still at twelve thousand.  A little over twelve thousand.*

*MILLER: Let's put it this way.  I was spending five to ten thousand dollars a week out of that account every day going out to dinner.  But now there's no money?  I mean I just don't get it.  I was going on vacations, blowing money every [expletive] second out of that account.  Now there's no money?  Yeah, I mean don't you think that's a little weird?*

b.     *July 9, 2019: MILLER and ASSOCIATE-1*

*MILLER: Go through your closets and find everything you got and let's try everything.*

*ASSOCIATE-1: [Laughter] Alright.*

*MILLER: You know?  What the hell right.  Try everything you can find.*

*ASSOCIATE-1: Yeah.  Dude a lot of it is 2012-2013 it's hard to collect on but like I said those Spotloans are 2014, I got 4 million of that left.*

*MILLER: You never know.  You never know.  Maybe somebody shelfed something and they never used it.*

*ASSOCIATE-1: You're right.*

10

*MILLER: Or these idiots took out more payday loans and they don't know which one it is.*

## EXECUTION OF SEARCH WARRANTS

### Seizure of the Defendant Currency at 316 Hamilton Boulevard,

### Kenmore, New York

17.     On April 30, 2020, United States Magistrate Judge Michael J. Roemer issued search warrants for the following locations:

a.      316 Hamilton Boulevard, Kenmore, NY, including detached garage and curtilage;

b.      315 Hamilton Boulevard, Kenmore, NY, including detached garage and curtilage;

c.      315 Moore Avenue, Tonawanda, NY, including detached garage and curtilage;

d.      1561 Kenmore Avenue, Kenmore, NY; and

e.      the adjacent garage located at 1555 Kenmore Avenue, Kenmore, NY;

18.     On May 7, 2020, pursuant to the authority of the federal search warrant issued for 316 Hamilton Boulevard, law enforcement officers seized the defendant currency.  The currency was located inside boxes in a closet in a spare bedroom at 316 Hamilton Boulevard. The currency was separated into bundles and wrapped with rubber bands.  At the time of the seizure, agents encountered J.C., the owner of the residence.   J.C. admitted to law

11

enforcement agents that the currency was being stored for Miller at this residence. It is believed that because Miller maintained many active bank accounts, he received substantial ongoing deposits of SUA proceeds which he liquidated. Despite having active bank accounts, Miller regularly liquidated funds and hid large amounts of bulk cash with a trusted third party.

19.     Prior to May 7, 2020, the investigation determined that J.C. is the mother of S.C.  S.C. resided at 315 Hamilton Boulevard which is across the street from the premises where the defendant currency was seized (316 Hamilton Boulevard).   S.C. is Miller's ex-girlfriend and the mother of his child.   During this time, Miller was known by law enforcement to frequent 315 Hamilton Boulevard.  The investigation further revealed that S.C. previously received money from Miller's debt collection scheme by receiving proceeds from Miller and Associates.  On May 7, 2020, Miller resided with his girlfriend A.S. at 315 Moore Avenue, Tonawanda, New York.

20.     Miller's New York State identification is registered to 316 Hamilton Boulevard, Kenmore, New York, and certain business banking documents of Miller's reference 316 Hamilton.  However, the investigation revealed that Miller did not reside at 316 Hamilton Boulevard or use the premises for business.  It is believed that Miller and S.C. had access and control of 316 Hamilton Boulevard (J.C.'s residence).

**<u>Search and Seizure of Evidence at</u>**

**<u>1561 Kenmore Avenue, Kenmore, New York</u>**

21.     On May 7, 2020, HSI executed a federal search warrant at Miller's office at 1561 Kenmore Avenue, Kenmore, New York.  Law enforcement officers collected written scripts at the desks of the employees, along with documents identifying various company names/addresses identifying Miller's various debt collection businesses and telephone numbers. For example, documents bearing the following information were posted at employees' desks which indicated Miller's collectors used a fake company name/address when collecting SUA proceeds:

OAK BARNES and ASSOCIATES
2316 Delaware Ave STE 205
Buffalo, NY 14216
Website: www.oakbarnes.com
Email: admin@oakbarnes.com
Callback Number 877-872-2319
Fax Number – 844-301-5015

**Debit/Pre-Paid Cards will be charged by "MSDP Processing"**

**Credit Card Payments through a Law Firm**

22.     Also, a script collected from 1561 Kenmore Avenue read, in part:

*This information is for _____ my name is Steve Roberts.  I'm calling in regards to an order submitted to my office. I am scheduled to come out around _____ to serve you court documents that are pertaining to pending charges that are being filed against you. Please understand this is my final attempt to deliver these documents. If I am unable to obtain your signature on my affidavit of services, I will have no choice but to forward these back to the filing firm as a Direct Refusal to accept them.*

23.     The execution of the search warrant at Miller's office at 1561 Kenmore Avenue and the analysis of evidence collected revealed that the office was an organized, standard call center for a debt collection business.   The scripts demonstrate that the employees were instructed to contact victims threatening false legal consequences in order to induce the victim to pay the debt.   At the employees' desks were computers, telephones, a variety of "shake down" scripts (see ¶ 22 above), various business names (some false), and telephone directory lists bearing false collectors' names.   Based on the totality of the evidence, there is cause to believe that Miller operated a wire fraud scheme/unlawful debt collection business in order to defraud victims via interstate wires.

## VICTIMS

24.     Victims were induced to make payments were directed to a merchant account/payment processor.   After those funds were received, they were funneled into Miller's numerous bank accounts through various mechanisms.   The investigation identified the following victim statements and transactions.

## J.M.

25.     Law enforcement agents spoke with J.M. who resides in Florida.   In or about October of 2019, J.M. received calls from a representative from American Elite Recovery about an alleged debt.   J.M.'s parents were also contacted regarding this nonexistent debt and were told that J.M. would be arrested if it was not paid.   In an attempt to collect a payment

from J.M., American Elite Recovery used J.M. and his/her spouse's personal information, including social security numbers.  J.M. stated, in sum and substance, that he/she was "berated" for over twenty minutes on the telephone and American Elite Recovery insisted that the courts were involved and J.M. would be arrested over this matter.  J.M. received a voicemail from someone claiming to be David Hampton from the Law Office of American Elite, advising J.M. that he needs to be "very careful" and that the courts are involved with the collection of this debt.  David Hampton was later identified by HSI as a debt collector employed by Miller.  J.M. received documents on American Elite Recovery letter head and a settlement document soliciting payment by American Elite Recovery for $532.50 stemming from a Spotloan; J.M. received these documents electronically from billing@americaneliterecovery.com.  J.M. ultimately refused to pay American Elite Recovery.  J.M. later determined that this outstanding debt balance was cancelled due to the loan's originator being subject to civil lawsuit proceedings and J.M. had no outstanding debt related to this attempt to collect by American Elite Recovery.

## **V.M.**

26.     Law enforcement agents spoke to V.M., who resides in Virginia.  In October of 2019, V.M. received phone calls from debt collectors claiming to be from Spotloan.  V.M. subsequently contacted Spotloan and was advised that no one from Spotloan contacted V.M. V.M. later identified the callers as American Elite Recovery after receiving a settlement letter from American Elite Recovery.  The communication from American Elite Recovery began

with the callers "Randy" and "Paul Colvin" using V.M.'s personal information and loan balance information.  V.M. believed that Randy and Paul Colvin are the same person.  The callers also used the name ARS Collections.  Randy stated that if V.M. did not respond to this payment request, American Elite Recovery would send someone to his/her house, and it will result in "federal charges."  V.M. then spoke to the manager (Associate) who setup payments with V.M.'s Apple Federal Credit Union debit card.  V.M. stated that the manager (Associate) was irate after he/she initially refused to pay.  Soon after submitting his/her debit/credit card payment information to American Elite Recovery, V.M. was contacted by his/her bank because the bank had detected several fraudulent charges to his/her account, in addition to the debt collection payment, that he/she did not authorize.

27.     V.M.'s Apple Federal Credit Union bank statement showed the following transaction:

11/01/2019   MSDP [Market Street Debt Partners] Processing  $300

28.     In November of 2019, Miller's Bank on Buffalo account in the name of American Elite Contractors received the following individual wire from the third-party payment processor Market Street Debt Partners which is believed to contain V.M.'s payment commingled with other victim proceeds with that week's total payments:

11/08/2019   $5,741.60

16

**B.M.**

29.     Law enforcement agents contacted B.M., who resides in Arizona.  In 2014, B.M. borrowed money from a payday loan when he/she was laid off.  B.M. stated that he/she paid this loan back in full.  In or about December of 2019, B.M. received phone calls from debt collectors.  B.M. stated that the callers claimed they were going to serve him/her with legal papers and there would be legal repercussions unless money was paid.  B.M. complied and paid at the callers' requests for payments.  B.M. paid $1,000 with two (2) $500 prepaid debit cards that B.M. purchased from a Safeway grocery store.  In or about December of 2019 and the subsequent months, Miller's bank accounts at Tonawanda Community Federal Credit Union bank records indicate that he received ongoing, weekly deposits from third-party payment processors.

30.     During the execution of the search and seizure warrants by law enforcement officers on May 7, 2020, B.M.'s personal information, debit/credit card information, and scheduled payments were located on a "Credit Card Authorization Form" at 1561 Kenmore Avenue (Miller's debt businesses' location).

**G.N.**

31.     Law enforcement agents contacted G.N., who resides in Pennsylvania.  G.N. stated that he/she paid debt collectors hundreds of dollars in December of 2019.  G.N. stated

that the callers threatened arrest by the Sheriff, claimed they would serve papers/process, and that G.N. will be subject of a lawsuit.  G.N. stated he/she paid the debt collectors through his/her Huntington bank account.

32.     G.N.'s bank statements show two transactions paid to Miller via third-party payment processor MSDP Processing (merchant identifier for Market Street Debt Partners):

        12/23/2019    MSDP Processing     $150
        01/06/2020    MSDP Processing     $408

33.     During the execution of the search and seizure warrants by law enforcement officers on May 7, 2020, at 1561 Kenmore Avenue (Miller's debt collection business location), G.N.'s personal information and scheduled payments were located on a document.

**H.S. and B.S.**

34.     Law enforcement agents contacted H.S. and B.S., who reside in North Carolina.  In or about December of 2019, H.S. and B.S. stated that they paid AME Associates debt collectors.  Initially, H.S., his/her spouse, and ex-spouse received ongoing calls from debt collectors threatening various repercussions unless money was paid.  The debt collectors stated they were filing a judgment against him/her for bank fraud stemming from an alleged outstanding payday loan.  H.S. stated that this loan was previously paid back in full and was not aware of an outstanding balance.  H.S. provided the callers with his/her bank information

18

and the debt collectors drafted approximately two payments.  H.S. said that the transaction appeared as MSDP Processing (the merchant identifier for Market Street Debt Partners).

35.    H.S.'s State Employees' Credit Union statement showed the following transactions:

| 12/26/2019 | MSDP Processing | $50 |
| 01/06/2020 | MSDP Processing | $581.25 |

36.    Miller's Tonawanda Community Federal Credit Union account in the name of AME Professionals received the following individual wires from Market Street Debt Partners which is believed to contain the victim's proceeds commingled with that week's total payments, each exceeding $10,000:

| 12/31/2019 | $15,210.31 |
| 01/10/2020 | $19,474.87 |

37.    H.S. provided the following transcribed telephone voicemail, which he/she received on or about December 23, 2019, which led to the payment:

"Hi this message is for [H.S.] my name is Michelle I'm calling you today in regards for an order I was [inaudible] my office this morning for you I'm scheduled to come out today between the hours of 12 and one to serve you some court documents they are addressing pending charges been filed against you so if you wanna find out there pertaining to or if you're just going to be available to sign some today at our [inaudible]

19

need to contact the filing firm just [inaudible] them immediately Uber is 888365775 time um if I don't hear back from which [inaudible] scheduled I will see you shortly [inaudible]  your home [inaudible]  employer and good luck…"

## C.G.

38.     C.G., who resides in Virginia, filed a complaint with the New York State Attorney General's Office against American Elite Recovery.  C.G. stated that in or about August of 2018, his/her father called saying that he was contacted by debt collectors looking to serve papers regarding a debt C.G. owed.  C.G. received a phone call from an alleged lawyer and alleged secretary from American Elite explaining that C.G. owed approximately $390.00 from an old account.  American Elite Recovery provided a settlement document to C.G. reflecting the alleged debt.  C.G. stated that the callers were aggressive and irate over C.G. owing this payment.  The callers from American Elite stated, in sum and substance, that they would garnish C.G.'s wages and file papers at C.G.'s local courthouse over the non-payment.  C.G. provided his/her Wells Fargo debit card information to the callers.  C.G. visited his/her local municipal courthouse and the officials advised that the callers' allegations were false.  C.G. said he/she contacted and confirmed with the original creditor that no money was owed on this account.  C.G. cancelled his/her Wells Fargo debit card before the payment transaction could be drafted.

## C.B.

39.     Law enforcement officers spoke to C.B., who resides in Washington State.  In or about December 2018, C.B. was contacted by Katie from American Elite.  C.B. was told that he/she owed an outstanding debt from an old payday loan and C.B. would face charges for bank fraud, internet fraud, and writing bad checks if he/she did not pay money to American Elite immediately.  C.B. said he/she did not recall writing a check.  American Elite told C.B. that if $600 was not paid immediately, charges would be forwarded to the County Court.  C.B. provided credit/debit card payment information to Katie at American Elite and setup payments for $600.  This payment was later declined due to insufficient funds.

40.     After this $600 payment was declined, C.B. said he/she began receiving ongoing phone calls and voicemails from David Hampton from American Elite.  C.B. said that he/she spoke to David Hampton on the phone about ten (10) times.  C.B. said David Hampton was abrasive, threatening, screamed at him/her, and brought him/her to tears. C.B. said that David Hampton claimed that unless money was paid, he would file a lawsuit against C.B. for a much higher balance than currently owed, garnish his/her disability wages, send him/her to jail, and send someone to show up at his/her home immediately after the phone call.  When C.B. advised David Hampton that she will file a complaint against him, David Hampton welcomed him/her to "complain all you want."  At one point, C.B. missed a call from David Hampton and he/she received numerous threatening voicemails within 10

minutes time.   After C.B. was induced to pay David Hampton, David Hampton obtained

C.B.s debit/credit card information to set up a payment plan which would collect the majority

of his/her disability wages during this time period.   C.B. paid money because he/she was

fearful of the charges that American Elite was going to file against him/her.   C.B. said he/she

eventually paid American Elite from a Chime debit card in or about January of 2019 to settle

the $600 that American Elite alleged was owed.   This payment was processed through Miller's

third-party payment processor, Law Firm.

41.    C.B.'s Chime bank statements showed the following transactions:

| 01/02/2019 | Law Firm | $150 |
| 01/03/2019 | Law Firm | $150 |
| 01/11/2019 | Law Firm | $250 |
| 01/12/2019 | Law Firm | $250 |

42.    In January of 2019, Miller's Bank on Buffalo account in the name of American

Elite Contractors received the following individual remits from Universal Acme Empire

which is believed to contain C.B.'s proceeds commingled with that week's total payments:

| 01/11/2019 | $6,200.81 |
| 01/18/2019 | $11,238.37 |

## **L.T.**

43.    L.T. provided the following statement (excerpt) to the Consumer Financial
Protection Bureau:

*Around January 2019, I received a call from American Elite Recovery, advising Cashnet was about to file a suit against me for approximately $2800. I negotiated with them, and came to an agreement for 3 biweekly payments of $127.00 dated for 1/17/19, 1/31/19, and 2/14/19. I received an email with the PPA (Payment Agreement) attached confirming this agreement. I was then transferred to a law firm. to collect payment information since the American Elite Recovery agent advised they weren't authorized take the payment. After the last payment was taken, I decided to wait the 10 business days like with other collection agencies to request a Proof of Settlement showing the debt was paid. I first tried calling them, but it always seemed the office was closed. On March 14, I decided to verify I was calling during the business hours listed on the letter sent via Email and leave Voicemails for them to contact me. Not being able to contact them also prompted me to research the organizations online. I discovered that the law firm has had its Better Business Bureau accreditation revoked. This led to me to contact the Consumer Financial Protection Bureau, whose agent confirmed those Collectors were not listed in their system.*

44.    L.T. provided documents to HSI which L.T. received from American Elite
Recovery on American Elite Recovery letterhead, sent electronically from
billing@americaneliterecovery.com, which offered a settlement for $521.35.  L.T. provided
proof of the transactions from his/her Chase bank account showing the funds paid to
American Elite Recovery via a third-party payment processor which was Law Firm.  The
Chase bank statement in L.T.'s name verified three payments of $127:

01/18/2019   A Law Firm   $127

02/01/2019   A Law Firm   $127

02/15/2019    A Law Firm    $127

45.    In January and February of 2019, Miller's Bank on Buffalo account in the name of American Elite Contractors received the following individual remits from Universal Acme Empire which is believed to contain L.T.'s proceeds commingled with that week's total payments:

01/25/2019    $14,512.55

02/08/2019    $7,992.10

02/22/2019    $11,039.45

## **T.C. and K.C.**

46.    Law enforcement officers spoke to T.C. and K.C., who reside in Nebraska. In January of 2020, T.C. and K.C. received calls from Oak Barnes and Associates over an alleged debt. T.C. and K.C. paid $1,711.06 with a Discover credit card that was processed by Miller's known payment processor, Law Firm. K.C. received correspondence from Oak Barnes and Associates via a U.S. Postal Service letter containing a payment invoice bearing what appears to be Miller's fake company's information; and another letter from the third-party payment processor, a law firm, warning that K.C. is committing bank fraud if he attempts to dispute the payment.

47.     T.C.'s Discover statement verified the transaction of $1,711.06 paid to Law Firm on 01/09/2020.

48.     The following is a transcript of Federal Trade Commission/Consumer Sentinel Network complaint filed by K.C. which T.C. and K.C. told HSI agents was true and correct. It is known by HSI that "Daniel Morgan" and "Trina Brown" are fake names used by debt collectors linked to Miller's scheme:

> So I got a voice mail from someone saying they are Daniel Morgan and they will serve court documents against me but before he serves me i can contact the firm. The firm was Oak Barnes Associates, I spoke to Trina Brow[n] they said their debt collectors collecting on a debt from 2014. They stated I could pay the balance of $1711.06 of the amount otherwise they would have a judgment against me and it would be upwards of $4,000 to pay. I asked if I could go home talk to my wife and explain whats going on, so I did. We then paid with our CC the 1711.06 they sent me a confirmation letter but its full of errors which was a red flag. I looked on Google and everything said Oak Barnes and Associates was a scam.

## T.F.

49.     Law enforcement officers contacted T.F., who resides in New Jersey. T.F. filed the Federal Trade Commission/Consumer Sentinel Network complaint transcribed below. T.F. verified with law enforcement that this complaint is true and correct. T.F. paid American Elite Recovery through Chime bank:

> I (T.F.) [name omitted] was contacted by American Elite Recovery around November 15, 2019. They informed me that I had a $500 debt to a Timelypayday.com, payday loan company that was outstanding. I told them I was unaware of this. I agreed to pay $75 via my debit card over the phone that day. Then setup payment arrangements for $150 approx over 2 more payments until the amount was satisfied in full. I called them back to ask for some verification of the debt. When I did they got nasty with

*me. They would not give me their address to request in writing proof of the debt or any notification. They told me if I do not pay this debt of a remaining $425 that they would send a police officer to my house and I would be arrested and go to jail. When I simply asked for some verification of this debt and the company, American Elite Recovery, they told me that my "wishes would be granted and they would now see me in court and I would spend Christmas in jail and I would not see my Son for Christmas because I will be in jail". I find this strange over a $425 debt being owed. I have never received any notifications in the mail. Or via any sort of proof of owing this debt. There are NO phone numbers to contact timelypayday.com I have looked all over the internet trying to find a contact number for this supposed "original creditor" This needs to be resolved somehow please.*

50.    T.F.'s Chime bank statements identified the following transactions paid to Miller via third-party payment processor which was Law Firm:

| | | |
|---|---|---|
| 11/18/2019 | Law Firm | $75 paid |
| 11/27/2019 | Law Firm | $171.28 denied |
| 12/02/2019 | Law Firm | $171.28 denied |

51.    In November 2019, Miller's Citizens Bank account in the name of American Elite Contractors as the payee received the following check from the third-party payment processor Law Firm which is believed to contain T.F.'s payment commingled with other victim proceeds with that week's total payments:

Check #3204          Date: 11/22/2019          Amount: $13,610.07

52.     During the execution of the search and seizure warrants by law enforcement officers on May 7, 2020, a settlement document on American Elite Recovery letter head bearing T.F.'s personal information and payment schedule was located at 1561 Kenmore Avenue (Miller's debt businesses' location).

## FINANCIAL ANALYSIS

53.     Law enforcement is aware that a payment processor is a necessary entity that facilitates a wire fraud scheme/unlawful debt collection operation by processing victims' payments (the SUA proceeds). Bank accounts maintained by the payment processors receive/transfer the SUA proceeds from the merchant payment processing accounts to bank accounts maintained by the unlawful debt collector.  In this case, for the 12 months prior to the May 7, 2020 seizure date, the third-party payment processors for Miller's unlawful debt collection activities were: Universal Acme Empire (a/k/a Law Firm)[2], Market Street Debt Partners, LLC, Great Lakes Processing, and K.K. (K.K.'s identity is known by HSI), hereinafter collectively as "the payment processors."

54.     Third party payment processors with access to merchant accounts are routinely used to handle (or "middle") the payments of victims on behalf of wire fraud schemes.

---

[2] Law Firm and Universal Acme Empire are two business names operating as one entity, processing payments for Miller as a third-party.

Typically, these payment processors take a fee, based on a percentage of the deposits being brought in, as "payment."

55.    A general financial review of bank accounts associated with Miller and his Associates identified transactions involving large, recurring sums of money received from the payment processors that were transmitted to bank accounts controlled by Miller.  Miller has been receiving ongoing remits of debt collection (SUA) proceeds since about 2017.  From the time a victim debit/credit card payment is affected by Miller's wire fraud scheme/debt collector, the SUA proceeds typically flow as follows:

a.  Miller through his wire fraud scheme/unlawful debt collection activity collects a victim's debit/credit card information as payment for an alleged outstanding debt.

b.  The victim's raw debit/credit card information is submitted to the merchant through the third-payment processors.

c.  The third-party payment processor provides the essential function of submitting the debit/credit card information to merchant account entities. Merchants transform the victims' raw debit/credit card payment information (i.e. name, card number, expiration date, charges, etc.) into actual money (SUA proceeds).

d.  When debit/credit card payments are processed by the merchant account entities, the merchant deposits the proceeds (typically batched in a lump disbursement) into the third-party payment processors' bank accounts.

e.  From the third-party payment processors' bank accounts, a weekly remittance containing victim payments/SUA proceeds are disbursed to Miller's bank accounts. A fee for services is believed to be retained or received by the payment processor.

f.  The weekly remittances disbursed to Miller from the third-party payment processors included numerous individual victim debit/credit card payments, which constitute SUA proceeds, were consolidated into a batched or "lump sum" weekly remittance.

28

56.     Once the SUA proceeds were deposited into Miller's bank accounts, the SUA proceeds were withdrawn, liquidated, and dissipated by Miller and Associates.

57.     From about September of 2017 to May of 2020, this payment process resulted in Miller's bank accounts receiving and liquidating the SUA proceeds.  A financial review of Miller's historical banking activity shows that Miller frequently changed banks and established a number of bank accounts mainly under the cover of a small, local roofing/construction business called American Elite Contractors and AME Professionals while in reality he primarily conducted this unlawful debt collection activity.

58.     Additionally, Universal Acme Empire (a/k/a Law Firm), Market Street Debt Partners, and K.K, have disbursed weekly remits to Miller, consisting of debt collection SUA proceeds, some of which individually exceeded $10,000.  The following charts demonstrate how SUA proceeds were disbursed to Miller in amounts exceeding $10,000 prior to the May 7, 2020, seizure date:

a. K.K. wired the following remittances exceeding $10,000 in violation of Title 18, United States Code, Section 1957, to Miller's M&T Bank Account (# 3914) about two months prior to the seizure of the defendant currency:

- March 11, 2020: $14,169.66

- March 18, 2020: $22,214.36

- March 25, 2020: $17,296.92

b.  During 12 months prior to the May 7, 2020 seizure date, the following wire transfers of SUA proceeds exceeding $10,000 in violation of Title 18, United States Code, Section 1957, from Market Street Debt Partners to Miller's bank accounts at Evans Bank (# 1231), Tonawanda Community Federal Credit Union (# 14350), and Riverside Community Federal Credit Union (# 4889):

| Account | Date of Transaction | Amount | Description |
| --- | --- | --- | --- |
| 1231 | 11/29/2019 | $15,277.08 | Incoming Wire |
| 1231 | 12/6/2019 | $14,625.76 | Incoming Wire |
| 4350 | 12/20/2019 | $26,510.94 | Incoming Wire |
| 4350 | 12/27/2019 | $21,183.06 | Incoming Wire |
| 4350 | 12/31/2019 | $15,210.31 | Incoming Wire |
| 4350 | 1/10/2020 | $19,474.87 | Incoming Wire |
| 4350 | 1/17/2020 | $24,346.80 | Incoming Wire |
| 4350 | 1/24/2020 | $22,166.35 | Incoming Wire |
| 4350 | 1/31/2020 | $25,748.54 | Incoming Wire |
| 4350 | 2/7/2020 | $22,028.59 | Incoming Wire |
| 4350 | 2/14/2020 | $10,922.08 | Incoming Wire |
| 4350 | 2/21/2020 | $13,026.66 | Incoming Wire |
| 4350 | 2/28/2020 | $16,800.94 | Incoming Wire |
| 4350 | 3/6/2020 | $16,290.64 | Incoming Wire |
| 4889 | 3/23/2020 | $18,874.44 | Incoming Wire |
| 4889 | 3/27/2020 | $19,456.95 | Incoming Wire |
| 4889 | 4/3/2020 | $14,528.71 | Incoming Wire |
| 4889 | 4/10/2020 | $11,424.23 | Incoming Wire |

c.  During the 12 months prior to the May 7, 2020 seizure date, the following deposits of SUA proceeds exceeding $10,000 in violation of Title 18, United States Code, Section 1957, from Universal Acme Empire (a/k/a Law Firm) to Miller's bank accounts at Evans Bank (# 1231), and Tonawanda Community Federal Credit Union (#14350):

| Account | Date of Transaction | Amount | Description |
| --- | --- | --- | --- |
| 1231 | 11/29/2019 | $12,920.08 | Deposit |
| 1231 | 12/6/2019 | $17,769.76 | Deposit |
| 4350 | 12/13/2019 | $11,106.16 | Deposit |

| 4350 | 12/27/2019 | $13,809.27 | Deposit |
|------|------------|------------|---------|
| 4350 | 1/17/2020 | $19,385.21 | Deposit |
| 4350 | 1/24/2020 | $17,249.11 | Deposit |
| 4350 | 1/31/2020 | $27,104.72 | Deposit |
| 4350 | 2/7/2020 | $32,001.98 | Deposit |
| 4350 | 2/14/2020 | $21,132.14 | Deposit |
| 4350 | 2/21/2020 | $21,147.41 | Deposit |
| 4350 | 2/28/2020 | $32,844.89 | Deposit |
| 4350 | 3/6/2020 | $18,985.03 | Deposit |

59.     The transmission of funds (SUA proceeds) obtained through the wire fraud scheme/unlawful debt collection to Miller and his business in amounts over $10,000 constitute money laundering, in violation of Title 18, United States Code, Section 1957 and such transactions are set forth in the charts herein.  Miller, after receiving SUA proceeds from the payment processors, used or transmitted the SUA proceeds for: car payments, debt collection related expenses (such as payroll and debt portfolios), withdrawals, checks paid to Associates, and at restaurants, at retailers, travel, and for other personal expenses.

## ACTIVITY THROUGH MILLER'S BANK ACCOUNTS

60.     From August 21, 2017 to May 7, 2020, Miller maintained bank accounts with six financial institutions.  A review of Miller's bank accounts show that a majority of banking transactions were related to his wire fraud scheme/unlawful debt collection business and not his purported small local roofing/construction business.  Miller received/liquidated SUA

proceeds through these six financial institutions in the 12 month time period prior to the May 7, 2020 seizure date:

- **Bank on Buffalo Accounts** # X5349 & X8477, in the name American Elite Contractors;

- **Citizens Bank Account** # X2938, in the name American Elite Contractors;

- **Evans Bank Account** # X1231, in the name AME Professionals;

- **Tonawanda Community Federal Credit Union Account** # X4350, in the name of AME Professionals;

- **Riverside Community Federal Credit Union**:

  Account # X4864, in the name Mark Miller;

  Account # X4889, in the name AME Professionals; and

  Account # X4865, in the name East Coast Business Solutions.

- **M&T Bank**:

  Account # X3914, in the name East Coast Business Solutions; and

  Account # X9287, in the name Mark Miller.


61.    Between September 2017 to May 7, 2020 (the date defendant currency was seized), Bank on Buffalo (Accounts # X8477 & X5349) in the name American Elite Contractors were utilized by Miller to collect proceeds from debt collection entities. The investigation showed that during this time, Miller was operating the wire fraud scheme/unlawful debt collection operation described herein. American Elite Contractors' payroll and bank account was commingled with the debt collection business.

a.  From about November 20, 2017 to February 23, 2018, Miller's Bank on Buffalo accounts received approximately $177,978.33 in debt collection remit deposits from Secured Billing Services. Secured Billing Services was identified as another third-party payment processor placing Miller's debt collection SUA proceeds during this time.

b.  From about February 28, 2018 to March 7, 2018, Account # 5349 in the name American Elite Contractors received three wire transfers indicative of payment processor remits from Zenith Financial Network[3] aggregately totaling $8,952.38.

c.  From about April 16, 2018 to June 8, 2018, Account # X5349 in the name American Elite Contractors received eight wire transfers indicative of payment processor/debt collection related remits from Cornerstone Resolution Group aggregately totaling $133,121.89. All of these disbursements were individually greater than $10,000 in violation of Title 18, United States Code, Section 1957.

d.  From July 6, 2018 to May 3, 2020, Account # X5349 in the name American Elite Contractors received wire transfers from Market Street Debt Partners totaling $254,513.24.

e.  From September 22, 2017 to May 3, 2020, (Account # X5349) in the name American Elite Contractors received deposits from Universal Acme Empire totaling $1,173,426.91.


62.  An aggregate total of SUA proceeds (12 months prior to the seizure date) received from payment processors that were disbursed to Bank on Buffalo (Account # X5349)

---

[3] On or about November 13, 2019, HSI executed a federal seizure warrant seizing the associated payment processing bank accounts and merchant accounts of Zenith Financial Network in violation of wire fraud and money laundering. The investigation indicated a scheme of a payment processor funneling SUA proceeds to a wire fraud scheme/unlawful debt collection businesses' bank accounts.

totaled $240,582.  Account # X5349 was opened by Miller on August 21, 2017 and was closed in early December of 2019 by him or the bank.

63.     From May 7, 2019 to November 29, 2019, Miller's Bank on Buffalo (Account # X5349) in the name of American Elite Contractors showed the following:

- Total wires received from Market Street Debt Partners: $112,472.04; and

- Total deposits received from Universal Acme Empire: $128,109.96[4].

64.     From September 23, 2019 to November 29, 2019, Northwest (Account # X2853) in the name of Law Firm (a/k/a Universal Acme Empire) issued checks, representing SUA proceeds, to Miller's bank accounts totaling $84,320.57.  Further review of the Law Firm account (Account #X2853) showed ongoing deposits from a BankCard merchant account which were received and then disbursed to debt collection clients, including Miller.

---

[4] The investigation indicated that Universal Acme Empire and Law Firm operated as one entity under separate names as Miller's third-party payment processor.  In some cases, debt collection remits were paid to Miller from the Law Firm bank accounts.

**Citizens Bank**

65.     From about November 15, 2019 to December 12, 2019, Miller and an Associate's Citizens Bank (Account # X2938) in the name American Elite Contractors showed wires received from Market Street Debt Partners totaling $11,605.58.   Account # X2938 was opened by Miller on November 13, 2019 and closed about December 12, 2019.

**Evans Bank**

66.     From November 29, 2019 to December 6, 2019, Miller's Evans Bank (Account # X1231) in the name of AME Professionals showed wires received from Market Street Debt Partners totaling $29,902.84, and deposits received from Universal Acme Empire totaling $30,689.84.

67.     SUA proceeds from the payment processors to Evans Bank totaled $60,592.68. Account # X1231 was opened by Miller on November 25, 2019 and was closed about December 11, 2019.   When opening this account, AME Professionals' cited "nature of business" as "Construction" by the signatories (Miller and Associate-2) on the Customer Information Profile document.   The financial investigation has revealed that Miller typically received roofing revenue in the form of check or cash paid from the client.   However, the flow of funds deposited into all Miller's accounts mainly consisted of debt collection revenue received from payment processors.

35

**Tonawanda Community Federal Credit Union**

68.     From December 9, 2019 to March 10, 2020, Miller's Tonawanda Community Federal Credit Union (Account # X4350) in the name AME Professionals showed wires received from Market Street Debt Partners totaling $233,709.78, and deposits received from Universal Acme Empire totaling $240,303.16.  Account # X4350 was opened by Miller on or about November 25, 2019 and closed on or about March 10, 2020 by the Credit Union.

69.     The Tonawanda Community Federal Credit Union closed the account when the banking activity revealed deposits from debt collection activity and not construction related activity.  Miller admitted to the bank employee that he does not conduct roofing business during the winter months and Miller admitted to engaging in "purchasing" debt. Miller's debt collection employees were paid weekly with checks from Miller's Tonawanda Community Federal Credit Union account.   However, the investigation indicated that Miller's businesses also used PAYCHEX, a payroll service and these ongoing checks made payable to debt collection employees appeared suspicious.

**M&T Bank Accounts**

70.     From March 11, 2020 to April 8, 2020, Miller's M&T Bank (Account # 3914) in the name East Coast Business Solutions received five wire transfers from K.K. originating

36

from EMPOWER Federal Credit Union totaling $68,177.48. Three of these wire transfers exceeded $10,000.  Account # 3914 was opened by Miller on March 2, 2020.

### Riverside Community Federal Credit Union

71.     From March 18, 2020 to May 1, 2020, Miller's Riverside Community Federal Credit Union (Account # X4889) in the name AME Professionals showed wires received from Market Street Debt Partners totaling $91,547.67, and one check deposit from Great Lakes Processing, and three wire transfers from K.K. (all originating from EMPOWER Federal Credit Union) totaling $19,446.48.

72.     SUA proceeds combined from the payment processors disbursed to Miller's Riverside Community Federal Credit Union accounts totaled $110,994.15.  Account # X4889 was opened by Miller on March 12, 2020.

### MILLER'S LIQUIDATION OF SUA PROCEEDS

73.     Miller instructed his Associates to cash checks in the Associate's names and to make cash withdrawals from the subject bank accounts.  The banking records analysis showed that SUA proceeds were commingled with a small amount of what appears to be income from his roofing company.  After the check or cash was withdrawn from the bank account, Miller would direct that a denomination of the cash be given to Miller or Miller's girlfriend(s).

74.     Further, the investigation revealed that from approximately March of 2020 through May of 2020, Miller's Tonawanda Federal Credit Union (# X4350), M&T Bank (# X3914), and Riverside Federal Credit Union (# X14889) received ongoing SUA proceeds from payment processors.  These accounts were used to pay recurring checks respectively to Miller's debt collection Associates and employees despite these accounts separately debiting ongoing funds to PAYCHEX, a payroll service.

75.     Miller's Bank on Buffalo (Account # X5349, in the name of American Elite Contractors) records reveal:

    a.    From May 10, 2019 to August 2, 2019, checks paid to Associate-1 totaling approximately $100,285;

    b.    On May 13, 2019, a check paid to Miller's girlfriend A.S. totaling approximately $11,500;

    c.    From May 17, 2019 to November 13, 2019, checks paid to Associate-2 totaling approximately $109,538; and

    d.    From May 28, 2019 to August 5, 2019, checks paid to "Cash" totaling approximately $16,900.

76.     From May 10, 2019 to November of 2019, proceeds liquidated from Bank on Buffalo (Account # X5349) while Miller was receiving ongoing SUA proceeds to this account from payment processors totaled approximately $238,423.

77.     For the time period prior to May 7, 2019 represented in paragraph 76, Miller executed seven cash withdrawals from Bank on Buffalo (September 25, 2017 to October 11,

2018) while receiving SUA proceeds from payment processors which totaled $61,652.95; aggregately totaling $300,075.95 in liquidated cash proceeds from September 25, 2017 to November 13, 2019.

78.    Miller's Citizens Bank (Account # X2938) in the name American Elite Contractors showed from November 15, 2019 to December 10, 2019, four cash withdrawals aggregately totaling $29,241.00.

79.    Miller's Evans Bank (Account # X1231) in the name of AME Professionals showed the following:

a.    On November 29, 2019, a checking withdrawal signed by Associate-2 of $11,883;

b.    On December 2, 2019, two checks paid to Associate-1 totaling $8,800; and

c.    On December 11, 2019, a "closing debit" of $23,837.96.

80.    From November 29, 2019 to December 11, 2019, proceeds liquidated from Evans Bank (Account # X1231) while Miller was receiving ongoing SUA proceeds into this account from payment processors totaled $44,520.96.

81.    Miller's Tonawanda Community Federal Credit Union (Account # X4350) in the name AME Professionals showed the following:

a.     From December 26, 2019 to January 29, 2020, eight checks paid to Associate-1 totaling $26,762;

b.     From December 13, 2019 to March 2, 2020, fourteen cash withdrawals totaling $29,072;

c.     From February 5, 2020 to February 26, 2020, four checks paid to Associate-4 totaling $39,264;

d.     On March 6, 2020, a check payable to Miller for $15,513.81; and

e.     Checks paid to Miller's Associates' businesses known to be associated to Miller's scheme: from January 10, 2020 to January 28, 2020, checks paid to Express Network Solutions totaling $53,100; and on March 6, 2020, a check paid to Simplicity, LLC for $9,816 (this amount is in pattern with the aforementioned checks paid out to Associate-4).

82.     From December 13, 2019 to March 6, 2020, proceeds liquidated from Tonawanda Community Federal Credit Union (# X4350) while Miller was receiving ongoing SUA proceeds to this account from payment processors totaled $173,527.81.

83.     Miller's M&T Bank (Account # X3914) in the name East Coast Business Solutions; and M&T (Account # X9287) in the name Mark Miller showed the following:

a.     A cash withdrawal from (Account # X3914) on March 11, 2020 for $6,000; and

b.     One cash withdrawal from (Account # X9287) on April 1, 2020 for $5,000; and one on April 2, 2020 for $4,600, both totaling $9,600.  Note that in addition to cash deposits into M&T (Account # X9287), Miller wire transferred Miller (himself) $6,000 to (Account # X9287) via M&T Bank on April 2, 2020.

84.     From March 11, 2020 to April 2, 2020, cash proceeds liquidated from Miller's M&T Accounts # X3914 and # X9287 while Miller was receiving ongoing SUA proceeds from payment processors totaled $15,600.

85.     Miller's Riverside Community Federal Credit Union Accounts # X4889 in the name AME Professionals and Account # X4864 in the name Mark Miller showed the following:

a.     From April 3, 2020 to May 7, 2020, checks paid from (# X4889) to Associate-3 totaling $19,540;

b.     From March 23, 2020 to April 14, 2020, four cash withdrawals totaling $17,620;

c.     On April 3, 2020, a check payable to Miller for $4,000; and

d.     On May 7, 2020, the date of the seizure, (Account # X4864) three cash withdrawals totaling $22,884.62. Account # X4864 received two transfers/deposits on April 13, 2020 and May 4, 2020 totaling $22,000 from (Account # X4889) which contained SUA proceeds; and a M&T Official Check deposit of $11,229.44 on April 14, 2020 paid to Miller (with Miller also on the check as the "remitter").

86.     From March 23, 2020 to May 7, 2020, proceeds liquidated from Riverside Community Federal Credit Union Accounts # X4350 and # X4889 while Miller was receiving ongoing SUA proceeds to these accounts from payment processors totaled $64,044.62.

## SUMMARY OF MILLER'S TRACEABLE SUA PROCEEDS

87.    The following chart details Miller's bank accounts that received SUA proceeds from payment processors ranging from September 27, 2017 to May 7, 2020 (seizure date). The transactions in this chart are detailed in paragraphs 60 through 72 above.   During this time an aggregate grand total of approximately $2,798,278.15 in debt collection proceeds from payment processors was deposited into Miller's bank accounts which Miller purportedly opened for the operation of a small, seasonal, construction/roofing business:

| Beneficiary | | | Remitter | Remitter | Remitter | Remitter | Remitter | Remitter | Remitter |
|---|---|---|---|---|---|---|---|---|---|
| **Miller's Bank** | **Acct.** | **Date Range** | **Market Street Debt Partners** | **Universal Acme Empire** | **Law Firm [Redacted]** | **Secured Billing Services** | **Zenith Financial Network** | **Cornerstone Resolution Group** | **Great Lakes Processing/ K. K.** |
| Bank On Buffalo | 8477 | 11/20/2017 to 02/23/2018 | | | | $177,978.33 | | | |
| Bank On Buffalo | 5349 | 09/27/2017 to 11/29/2019 | $366,985.28 | $1,301,536.87 | | | | $8,952.38 | $133,121.89 |
| Citizens Bank | 2938 | 11/15/2019 to 12/12/2019 | $11,605.58 | | | | | | |
| Evans Bank | 1231 | 11/29/2019 to 12/06/2019 | $29,902.84 | $30,689.84 | | | | | |
| Tonawanda CFCU | 3500 | 12/09/2019 to 03/10/2020 | $233,709.78 | $240,303.16 | | | | | |
| Riverside CFCU | 4889 | 03/18/2020 to 05/07/2020 | $91,547.67 | | | | | | $19,446.48 |
| M&T Bank | 3914 | 03/02/2020 to 04/15/2020 | | | | | | | $68,177.48 |
| *Aggregate Total | | | | | $84,320.57 | | | | |
| Remitter Totals | | | $733,751.15 | $1,572,529.87 | $84,320.57 | $177,978.33 | $8,952.38 | $133,121.89 | $87,623.96 |
| **Grand Total of SUA Proceeds Received by Miller** | **09/27/2017 to 05/07/2020** | <u>**$2,798,278.15**</u> | | | | | | | |

88.   From May 7, 2019 to May 7, 2020, 12 months prior to the seizure of the defendant currency, Miller's bank accounts received an approximate gross total of $1,050,285.40[5] of SUA proceeds disbursed by: Universal Acme Empire (a/k/a Law firm); Market Street Debt Partners; Great Lakes Processing; and K.K.

89.   The investigation of banking activity associated with Miller and his third-party payment processors revealed a regular ongoing pattern of SUA proceeds transferred by the payment processors to Miller's bank accounts.  Miller stated to the financial institutions who opened the accounts that the accounts were purportedly to be used for small seasonal contracting/roofing business.   However, based on the totality of the evidence there is reasonable cause to believe that the accounts facilitated Miller's wire fraud scheme/unlawful debt collection money laundering activity.  Miller's use of numerous financial institutions was an effort to conceal and commingle illicit proceeds consisting of unlawful debt collection revenue amongst small amounts of legally sourced roofing income (and sometimes no legally sourced income).  This scheme transmitted large amounts of SUA proceeds obtained from debt collection victims through third-party payment processing/merchant accounts to

---

[5] $1,050,285.40 is a fractional part of the $2,798,279.15 aggregate total described in paragraphs 87 and 88.

Miller's various bank accounts. The SUA proceeds were then withdrawn from the accounts' large sums over short periods of time.

90.     From May 7, 2019 to the May 7, 2020 (defendant currency seizure date), all of Miller's bank accounts herein collectively liquidated a total of approximately $565,357.39 of traceable SUA proceeds. This total does not include frequent debit card/point of sale transactions by Miller for personal expenses from these accounts containing SUA proceeds. The $565,357.39 in SUA proceeds were liquidated as follows:

- $150,338.58 in cash withdrawals;

- $36,413.81 in checks payable to Miller or "cash;"

- $378,605 in checks collectively paid out to Associate(s) 1, 2, 3 and 4, all of whom were involved in Miller's scheme operating under Miller's control.

91.     The liquidated total of $565,357.39 in traceable SUA proceeds does not include SUA proceeds routed through Miller's accounts prior to May 7, 2019. It is known that Miller has been engaging in this wire fraud/money laundering scheme since at least September 2017. Financial and bank record analysis revealed that the scheme by Miller received and withdrew SUA proceeds from his accounts in amounts that well exceeded the $90,385 seized from a closet on May 7, 2020. Miller and Associates knowingly defrauded victims under duress, who made payments to third-party payment processors who then deposited the SUA proceeds into the banking system. Over time, Miller and Associates liquidated approximately

$2,798,278.15 of traceable SUA proceeds, part of which is believed to be the defendant currency seized on May 7, 2020.

92.     From approximately February 7, 2020 to the May 7, 2020 seizure date of the defendant currency (three months prior to the seizure), Miller's bank accounts collectively liquidated a total of approximately $138,422.43 of traceable SUA proceeds.

93.     Banking records revealed that from May 7, 2019 to October 31, 2019, only approximately $75,455.27 in roofing income was deposited in the form of checks from Miller's roofing or construction activity. There were no apparent deposits of roofing income into Miller's accounts from November 1, 2019 to May 7, 2020.  In the 12 months of banking activity through all Miller's construction/roofing accounts prior to May 7, 2020 (seizure date), roofing proceeds credited to these accounts represented only approximately 7.2% of the total deposits/income.

**FOR A FIRST CAUSE OF ACTION**

94.     The allegations contained in paragraphs 1 through 93 are re-alleged and incorporated herein by reference.

95.     Pursuant to Title 18, United States Code, Section 981(a)(1)(C), civil forfeiture is available for any property, real or personal, which constitutes or is derived from proceeds

traceable to a violation of any "specified unlawful activity," defined in Title 18, United States Code, Section 1956(c)(7).

96.     The definition of "specified unlawful activity" in Title 18, United States Code, Section 1956(c)(7) incorporates the definitions contained in Title 18, United States Code, Section 1961(1)(B), which includes Title 18, United States Code, Section 1343 (wire fraud) and Title 18, United States Code, Section 1349 (conspiracy to commit wire fraud).

97.     The HSI investigation has revealed that individuals were coerced to make payments under the belief that there was a debt owed, or that a debt already paid was still owing (at a higher amount), and that criminal charges or arrest would follow if payment was not received.  Such transactions were facilitated by Miller and/or his employees prompting victims to make immediate payments via credit card or debit card transactions.  Those monies were then transferred from merchant accounts to businesses operated by Miller.

98.     Based upon the foregoing, there is cause to believe that the defendant currency is subject to seizure and forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) in that the defendant currency constitutes, or is derived from proceeds traceable to Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 1349.

## FOR A SECOND CAUSE OF ACTION

99.    The allegations contained in paragraphs 1 through 93 are re-alleged and incorporated herein by reference.

100.    Pursuant to Title 18, United States Code, Section 981(a)(1)(A), civil forfeiture is available for any property, real or personal, involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1957, or any property traceable to such property.

101.    The HSI investigation has revealed and bank records indicated that Miller is the signatory on several accounts which show 316 Hamilton Boulevard, Kenmore, New York as Miller's address and these accounts are believed to have funneled the SUA proceeds to Miller.  Further, upon execution of the search and seizure warrant, the currency was found wrapped in rubber bands, with J.C. admitting that the currency was being stored for Miller.

102.    By reason of the foregoing, there is cause to believe that the defendant currency, is subject to seizure and forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A) in that the defendant currency was involved in a transaction in violation of Title

18, United States Code, Section 1957 (monetary transactions in property derived from certain unlawful activity), or as currency traceable to such property.

## REQUEST FOR JUDICIAL PROCEEDINGS

103.    On or about July 14, 2020, Mark Miller, through his attorney, Cheryl Meyers Buth, Esq., submitted a claim to the defendant currency to halt the administrative forfeiture proceedings and for institution of judicial forfeiture proceedings.

## CONCLUSION AND REQUEST FOR RELIEF

104.    Based upon the foregoing, there is cause to believe that the defendant currency is subject to seizure and forfeiture pursuant to: (1) Title 18, United States Code, Section 981(a)(1)(C) in that the defendant currency constitutes, or is derived from proceeds traceable to Title 18, United States Code, Sections 1343 and 1349; and (2) pursuant to Title 18, United States Code, Section 981(a)(1)(A) in that the defendant currency is property involved in a money laundering transaction and/or is property traceable to such property.

49

WHEREFORE, the plaintiff requests the following relief:

(a)     that an Arrest Warrant in rem be issued for the defendant currency;

(b)     that notice of this action be given to all persons known or thought to have an interest in or right against the currency;

(c)     that judgment be entered declaring the defendant currency be forfeited and condemned to the United States of America for disposition in accordance with law; and

(d)     that the plaintiff be awarded its costs and disbursements in this action and for such other and further relief as this court deems proper and just.

DATED: Buffalo, New York, April 1, 2021.

JAMES P. KENNEDY, JR.
United States Attorney
Western District of New York

BY:   s/MARY CLARE KANE
Assistant United States Attorney
138 Delaware Avenue
Buffalo, New York   14202
(716) 843-5809
mary.kane@usdoj.gov

50

STATE OF NEW YORK)
COUNTY OF ERIE        ss
CITY OF BUFFALO      )


THOMAS W. MOZG, being duly sworn, deposes and says:


I am a Task Force Officer with the United States Immigration and Customs Enforcement, Homeland Security Investigations within the Department of Homeland Security. I am the agent assigned to the forfeiture case against $90,385 in United States currency on behalf of the United States of America. The facts alleged in the Complaint for Forfeiture are true to the best of my knowledge and belief based upon information officially furnished to me by the officials of the Department of Homeland Security, and provided to the officials of the United States Department of Justice, United States Attorney's Office.



s/Thomas W. Mozg
Homeland Security and Immigration
Task Force Officer


Subscribed and sworn to before
me this 1st day of April, 2021.


s/Cheryl LoTempio
      Notary Public

Cheryl LoTempio
Notary Public, State of New York
Qualified in Erie County
Commission Expires 6/20/2022